**BELLSOUTH
TELECOMMUNICATIONS, INC.,
Plaintiff–Appellant,**

v.

**W.R. GRACE & CO.—Conn.,
Defendant–Appellee.**

No. 107, Docket 95–7132.

United States Court of Appeals,
Second Circuit.

Argued Oct. 5, 1995.

Decided Feb. 21, 1996.

Philip Allen Lacovara, New York City (H. Thomas Byron III, Mayer, Brown & Platt, New York City; A. Camden Lewis, Mary G. Lewis, Lewis, Babcock & Hawkins, Columbia, SC; J. Anderson Berly, III, Ness, Motley, Loadholdt, Richardson & Poole, Charleston, SC; Fred A. Walters, BellSouth Telecommunications, Atlanta, GA, on the brief), for Plaintiff–Appellant BellSouth Telecommunications, Inc.

Robert P. Dolian, Stamford, CT (Lawrence A. Farese, Mark E. Fuhrmann, William H. Narwold, David B. Teitelman, Rosanne C. Baxter, Cummings & Lockwood, Stamford, CT, on the brief), for Defendant–Appellee W.R. Grace & Co., Conn.

Before: WINTER, JACOBS and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

This appeal requires us to determine when a claim for property damage caused by asbestos accrues under Connecticut law. An asbestos-containing fireproofing material manufactured by W.R. Grace & Co. under the trade name Monokote was installed in the headquarters building of BellSouth Telecommunications, Inc. ("BellSouth") when it was constructed in Birmingham, Alabama. On January 19, 1993, BellSouth, as the building's owner, brought this action in the United States District Court for the District of Connecticut (Daly, *J.*) under the Connecticut Product Liability Act, Conn.Gen.Stat.Ann.

§ 52–572M to –572N (West Supp.1995), seeking to recover from W.R. Grace the cost of BellSouth's building-wide asbestos abatement. The Act provides that all claims for product-related damage must be brought within three years from the date of discovery of injury. *Id.* § 52–577A(a). W.R. Grace does not contest the application of Connecticut law to this dispute. Accordingly, if the action accrued prior to January 19, 1990, it is time barred.

Around 1983, BellSouth learned that asbestos fireproofing in the headquarters building could pose health risks to its employees. From 1984 to 1992, BellSouth incurred costs in excess of $2 million in conjunction with remedial efforts designed to prevent or reduce asbestos contamination. These remedial efforts notwithstanding, an independent study determined in 1992 that the fireproofing had decayed such that asbestos dust and airborne asbestos fibers posed a substantial health hazard to BellSouth employees. Soon thereafter, BellSouth decided that it had become necessary to remove all Monokote fireproofing from the building, a project which it is currently undertaking at a cost that BellSouth's consultants estimate at approximately $85 million.

After extensive discovery, W.R. Grace moved for summary judgment on the ground that BellSouth's claim was barred by the three-year limitation period of the Connecticut Product Liability Act. On August 5, 1994, the district court referred Grace's motion to Magistrate Judge Thomas P. Smith for recommendation and for proposed findings of fact, pursuant to Federal Rule of Civil Procedure 72(b). Magistrate Judge Smith found that BellSouth had discovered actionable injury prior to January 19, 1990, and that its claims were therefore time-barred. On December 16, 1994, the district court endorsed and adopted Magistrate Judge Smith's unreported opinion, and granted Grace's motion for summary judgment of BellSouth's claims.

BellSouth appeals chiefly on the ground that it raised material issues of fact as to when the corporation became aware that abatement was a necessary or suitable strategy for dealing with the presence of the

asbestos fireproofing, and that the magistrate judge erroneously resolved these fact issues in favor of movant W.R. Grace.

Following a thorough survey of Connecticut law and of the record in a light most favorable to BellSouth, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), we affirm the district court's decision.

## BACKGROUND

BellSouth's headquarters building was constructed in Birmingham, Alabama in the period 1969–1971. In 1971, W.R. Grace's Monokote fireproofing material, which contains asbestos, was installed throughout the building. Asbestos is a flame-retardant and heat-resistant fibrous mineral that was commonly used in fireproofing in buildings, ships, and protective fireproof garments at least as early as the nineteenth century.[1] Asbestos containing material ("ACM") such as Monokote poses a health threat if and when it becomes "friable," an adjective describing a state of decay in which asbestos fibers or dust are released from ACM when disturbed. Friable asbestos poses a health risk because airborne fibers can become lodged in the lungs and respiratory tract, and over time may lead to asbestosis, mesothelioma and lung cancer. The health risks posed by friable fireproofing can be addressed either by abatement, which entails the complete removal of all ACM, or by special operations and maintenance practices (occasionally referred to as "O & M"), which prevent disturbance of the ACM that may otherwise result in asbestos fibers being released into the air.[2] The health threat that asbestos poses varies with the degree of exposure to airborne fibers; consequently, asbestos-containing fireproofing may be safely maintained indefinitely if the resulting airborne concentration of asbestos fibers remains low.

In 1982, BellSouth learned that some of its buildings contained asbestos fireproofing, that asbestos fibers could be released into the air during renovations or maintenance activities, and that the dangerous condition thereby created could violate federal law. In 1984, BellSouth formed an Occupational Health Committee to develop a "standard policy relating to asbestos exposure." On September 13, 1984, the committee circulated a 43–page asbestos manual that reviewed various asbestos related illnesses, methods for minimizing employee exposure to asbestos fibers, and legal remedies for owners of buildings containing asbestos. On October 30, 1984, BellSouth issued a memorandum instructing all building managers to conduct asbestos surveys, to remove badly deteriorated ACM that posed serious health risks to employees, and to maintain all non-decayed ACM in place.

In April 1985, BellSouth hired Marsh & McLennon Protection Consultants to survey the headquarters building for friable asbestos. Marsh & McLennon detected elevated levels of airborne asbestos in isolated areas of the building, and informed BellSouth that suspended asbestos particles in those areas could pose a health threat to BellSouth employees. In response to that report, BellSouth formed an informal committee consisting of senior managers from corporate departments responsible for real estate, legal affairs, labor relations, public relations, and employee health and safety, in order to "coordinate actions to be taken in response to the discovery of asbestos material." On July 1, 1985, the committee hired Law Engineering, a scientific consulting firm, to measure airborne asbestos levels and to recommend a remedial course of action. On

---

1. Asbestos is a generic term referring to several fibrous silicate minerals that are able to withstand tremendous heat and fire. While asbestos was reportedly used by the Greeks and Romans, in more modern times asbestos was produced and sold commercially "as an insulator against heat as early as 1866, and asbestos cement was introduced about 1870." *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083 n. 3 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

2. For example, asbestos-containing fireproofing can be wrapped in protective coverings to prevent asbestos fibers from being released. In addition, special maintenance procedures can be implemented to prevent any disturbance of fireproofing that might result in the release of asbestos fibers or dust.

September 25, 1985, Law Engineering reported that it had detected "elevated, localized airborne asbestos fiber levels" in certain areas of the building that may have resulted from "disturbance of friable asbestos-containing materials." Law Engineering's report offered

> two options available to eliminate or control [the localized] contamination: 1) Removal of the asbestos-containing material, or 2) Establishing a retention management and maintenance program with diligent monitoring.
>
> If the asbestos-containing material is badly deteriorated and there is evidence of extensive and continuous airborne contamination then the prudent recourse would be to initiate a comprehensive removal project.

Acting upon these recommendations, BellSouth implemented an operations and maintenance program in September 1985. The program was outlined by way of a series of recommendations in a document entitled "Operations and Maintenance Manual":

> Until the problem is solved through complete removal of asbestos-containing material *IT IS RECOMMENDED* that there be:
>
> (1) Vigilant, periodic inspection and observation to confirm unchanged, safe conditions....
>
> (2) Notification and training of custodial, maintenance, [and] construction [personnel], and occupants....
>
> (3) Strict prohibition against removing ceiling tiles or other invasions of ceilings....
>
> (4) Strict prohibition of maintenance procedures above ceilings, unless they are carried out under carefully controlled and contracted conditions by trained personnel with appropriate protection.
>
> (5) Restrictions on alterations and remodeling to prevent the potential for risk to building users as well as to construction workers. There will be risk if asbestos-containing materials are disturbed without

proper precautions to control fiber release, to avoid contamination of air handling equipment and ducts, and to clean contaminated areas and surface[s]....

The manual prescribes elaborate procedures for simple maintenance tasks, including a protocol for changing light bulbs and cleaning light fixtures.[3] In addition, the manual implements precautionary procedures for removing contaminated carpet, removing contaminated ceiling tiles, and installing wires in contaminated areas.

In early 1986, BellSouth retained the architectural firm of Bull & Kenney ("Bull") to perform another analysis of airborne asbestos levels and to recommend procedures to minimize any further contamination. On April 8, 1986, Bull reported that it found Monokote fireproofing on all but four of the thirty floors in the building, and estimated that asbestos-containing material was present in approximately 80% of the building's total enclosed floor area. Bull's report discussed three possible remedies: encapsulation, enclosure, or removal of the ACM. Bull recommended against encapsulation, and recommended enclosure only "in certain small areas where ACM is now exposed." The step that Bull most strongly endorsed was

> Complete removal of the asbestos-containing fireproofing material as the best method of abatement. Removal of the source is, of course, the only permanent remedy.

However, Frank J. Bull (a principal in Bull & Kenney) later averred in a sworn affidavit that this report was not intended to imply that there was an immediate asbestos hazard requiring removal. Frank Bull stated that "it was my belief at that time that the fireproofing could successfully be managed in place on an indefinite basis," in accordance with appropriate O & M practices. Some documentary evidence supports this statement. On May 21, 1985, after meeting with Frank Bull, R. Manson Crotty, a BellSouth manager in charge of building management, wrote in a memorandum to his file that main-

---

3. BellSouth's six-step procedure for changing light fixtures requires workers to wear respirators, drape plastic drop covers underneath the area in which work is performed, wet wipe the entire surface of the light fixture and fluorescent tube, and discard all materials used during the light-changing operation in a special "contamination barrel."

tenance of the ACM "should be an acceptable alternative to abatement."

In April 1986, BellSouth retained McCrone Environmental Services to conduct a study of the airborne asbestos levels in the building. McCrone detected a high concentration of asbestos particles in carpet samples, which (it surmised) resulted from dispersion through the air-conditioning system and from carriage on employees' shoes. In a subsequent study, however, McCrone detected no trace of asbestos in 61% of its air samples, and informed BellSouth that the overall levels of airborne asbestos particles "are comparable to those found in the outside air in major metropolitan cities." In a November 21, 1986 memorandum to H.E. Palmes, vice-president for corporate affairs, Charles S. Ferris, BellSouth's vice-president for corporate support, wrote that management was

> continuing to learn how to live with asbestos.... [B]y mid–1987, we should have enough information and experience on the cost of living with it to either reaffirm our present course [of maintenance] or alter our direction toward abatement.

In 1987, BellSouth instructed BCM Converse, an engineering firm, to study the economic feasibility of partial and complete abatement. BCM's March 1987 study compared the costs of building-wide abatement with the costs of continued O & M efforts. BCM estimated the total cost of removal at $10 million, and the total cost of continued operations and maintenance over 30 years at $72 million. This study, as with many of the studies that BellSouth commissioned, offered equivocal recommendations:

> Though removal is the only final solution to this problem, it may not be immediately practical. The only alternative to removal in this case is continuation of the Operations and Maintenance (O & M) Program.... *O & M is a viable alternative* to removal as a temporary measure until removal is feasible. However, the implementation of an O & M program can be, in the long run, equally as expensive or perhaps more expensive than the removal of [ACM].

> . . . .

In summarizing and concluding this report, BCM feels that it would be *preferable to remove asbestos containing materials from the building rather than continue Operations and Maintenance.*

(Emphasis added). In late March 1987, BellSouth issued new company-wide guidelines mandating that badly damaged ACM be removed from all buildings, and began a program of limited abatement of heavily contaminated areas of the building.

BellSouth submitted affidavits from several managers who averred that, in light of these studies, their belief around 1986 and 1987 was that the presence of asbestos did not present a health risk for BellSouth employees, and hence that abatement was unnecessary. These averments are consistent with the deposition testimony of several BellSouth managers. For example, Charles S. Ferris testified at his deposition that in 1986 and 1987 "it seemed very clear to me that the only reasonable thing to do was to monitor that building constantly ... and if we could maintain the building in a way that was safe, that we were best off just to continue to do that."

BellSouth continued its program of asbestos maintenance and containment through the next several years. In 1989 and 1990, follow-up studies indicated that asbestos contamination was not spreading, and that the background level of suspended asbestos particles was well below recommended levels published by the Occupational Safety and Health Administration and the Environmental Protection Agency. In November 1989, BCM reported that "no asbestos fibers were detected ... on fourteen of the fifteen samples," and that "the levels of airborne asbestos fibers in the headquarters building are not significantly different from levels in a building that contains no asbestos." There is no evidence in the record regarding contamination levels from 1989 through 1991. A January 1992 report by JV Associates, an engineering firm, concluded that asbestos levels were "well controlled" and that health risks from exposure were minimal.

Late in 1992, however, the outlook for the BellSouth headquarters building drastically worsened. On December 22, 1992, Law As-

sociates[4] reported to BellSouth that it had detected alarmingly high levels of airborne asbestos fibers and asbestos dust. Seven of the dust samples that Law Associates had collected "confirm[ed] the presence of significant numbers of asbestos structures." According to BellSouth, it realized that abatement was necessary when it received the report from Law Associates, which stated:

> In our opinion, since the time [previous reports were] completed, recent deterioration has occurred to the asbestos-containing fireproofing in the [BellSouth] Headquarters Building. We base our conclusions on the significant concentrations of settled dust ... [and] on our visual inspection of the fireproofing.... This information demonstrates that recent damage and delamination has occurred and dust and debris has been generated. We believe that these results show deterioration of the fireproofing resulting in significant contamination in the building.

On receipt of the December 1992 report, BellSouth commissioned Law Associates to undertake a more detailed study of the extent and severity of asbestos contamination in the building. In January 1994, Law Associates reported that its investigation "revealed heavy contamination," and substantiated "the progressive nature of contamination beneath the ceiling.... [I]t is apparent that the subject fireproofing material is continuing to deteriorate, releasing dust and debris." Law Associates concluded that:

> indefinite, in-place management of the fireproofing material is neither practical, realistic, nor recommended.... [I]t is our recommendation that planning for the prompt, systematic removal of the subject fireproofing material be initiated immediately.

Removal is now underway, and BellSouth estimates its total costs at approximately $85 million.

## DISCUSSION

The district court adopted the key finding of the magistrate judge that BellSouth knew by late 1987 "of the asbestos hazard present in the Building, appreciated its nature and extent, and realized that abatement was both expensive and inevitable.... Furthermore, by late 1987 it appears that BellSouth knew that a legal remedy was then available to it." The district court endorsed the magistrate judge's conclusion that "there is no genuine issue of material fact that BellSouth's cause of action accrued before January 1990," and that BellSouth's claim was therefore time-barred. Accordingly, the district court granted Grace's motion for summary judgment. On appeal, BellSouth contends that there are genuine issues of material fact that preclude the grant of summary judgment.

### A. Applicable Legal Standards.

■ We review the district court's grant of summary judgment *de novo*. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Summary judgment is proper only if, viewing all evidence in the light most favorable to the non-movant, there is no genuine issue of material fact. *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995). We have stated that "[t]hese principles apply whether summary judgment is granted on the merits of the claim, or on an affirmative defense such as the statute of limitations." *Id.* Thus, while a statute of limitations defense lends itself "to proof required by Rule 56 and therefore [may be] asserted successfully" on a motion for summary judgment, 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2734, at 419 (1983), "[t]he court will refuse to grant summary judgment for the defendant if there is an issue of fact as to when the limitations period began." *Id.* § 2734, at 421.

■ The parties have briefed the issues under Connecticut law here and to the district court, and neither party has interposed a challenge to that choice of law. "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d

4. The successor company to Law Engineering.

Cir.1994) (predicting New York law); *see also Minotti v. Lensink,* 798 F.2d 607, 610–611 (2d Cir.1986) (predicting Connecticut law), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

Connecticut's product liability statute governs actions against product manufacturers for "harm caused by a product." Conn.Gen. Stat.Ann. § 52–572n(a). Connecticut's statute replaces all other theories of product liability, including negligence and strict liability. *Id.* § 52–572m(b). In relevant part, the statute provides that "harm" consists of "damage to property . . . and personal injuries including wrongful death," but not "commercial loss" or other forms of economic loss. *Id.* § 52–572m(d). The statute of limitation governing product liability claims reads as follows:

> (a) No product liability claim as defined in section 52–572m shall be brought but within three years from the date when the injury, death or *property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered....*

*Id.* § 52–577a (emphasis added). In determining when a claim is "first sustained or discovered," the Connecticut courts adhere to the general rule that

> The true test [to determine accrual for statute of limitations purposes] is to establish the time when the plaintiff *first could have successfully maintained an action.*

*Gaylord Hosp. v. Massaro,* 5 Conn.App. 465, 467, 499 A.2d 1162, 1163 (1985) (emphasis added). BellSouth filed its complaint on January 19, 1993. That claim is therefore time-barred, as the district court found, if BellSouth could have maintained a claim under Connecticut law against Grace for asbestos-related property damage prior to January 19, 1990. We must ascertain whether any issue of material fact defeats that finding.

### B. Claim Accrual in Asbestos Abatement Cases.

■ As we have said, Connecticut's product liability statute replaces all causes of action grounded in strict liability and negligence with a claim for "harm caused by a product." Conn.Gen.Stat.Ann. § 52–572n(a). In abatement cases, the harm that allegedly results from the use of asbestos-containing products is the *"contamination* of the . . . building[ ] by asbestos and the consequent health risk to the building['s] occupants." *Tioga Pub. Sch. Dist. # 15 v. United States Gypsum Co.,* 984 F.2d 915, 918 (8th Cir.1993) (emphasis added); *see also MDU Resources Group v. W.R. Grace & Co.,* 14 F.3d 1274, 1279 (8th Cir.) ("[I]njury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos."), *cert. denied,* — U.S. —, 115 S.Ct. 89, 130 L.Ed.2d 40 (1994); *Adams–Arapahoe Sch. Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 872 (10th Cir.1992) (compensable physical injury consists of "contamination of the building or other property as a result of fibers released from asbestos products"). No Connecticut state court has applied the product liability statute in the context of a claim for property damage caused by asbestos. We must therefore predict how the Connecticut Supreme Court would rule if faced with this issue. *Travelers,* 14 F.3d at 119.

■ We are guided by the Connecticut Supreme Court's application of Connecticut's medical malpractice statute, which employs the same discovery statute of limitations as that employed by Connecticut's product liability statute.[5] Under the medical malpractice statute, "injury occurs when a party suffers some form of *'actionable harm.'* " *Catz v. Rubenstein,* 201 Conn. 39, 43, 513 A.2d 98, 100 (1986) (quoting *Burns v. Hartford Hosp.,* 192 Conn. 451, 460, 472 A.2d 1257, 1261 (1984)) (emphasis added). Actionable harm occurs "when the plaintiff discov-

---

**5.** Medical malpractice actions are governed by Connecticut General Statute § 52–584, a "discovery" statute of limitations that is closely analogous to § 52–577a(a). Section 52–584 provides:

> No action to recover damages for injury to the person . . . shall be brought but within two years from the date when the injury is *first sustained or discovered or in the exercise of reasonable care should have been discovered....*

Conn.Gen.Stat.Ann. § 52–584 (emphasis added).

ers, or in the exercise of reasonable care should have discovered, the essential elements of a cause of action." *Lambert v. Stovell,* 205 Conn. 1, 6, 529 A.2d 710, 713 (1987). In determining whether a plaintiff's claim has accrued, "[t]he focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." *Catz,* 201 Conn. at 47, 513 A.2d at 102. The essential elements of a tort cause of action (whether in negligence or strict liability) are tortious conduct, actual injury, and a causal connection between the defendant's tortious actions and the resultant injury. *Id.,* 201 Conn. at 44, 513 A.2d at 100–101.

These general theories of claim accrual were applied in the context of an asbestos abatement case by the District of Connecticut in *West Haven Sch. Dist. v. Owens– Corning Fiberglas Corp.,* 721 F.Supp. 1547 (D.Conn.1988). Ruling on a motion for summary judgment to dismiss an abatement claim as time-barred, Judge Nevas wrote that for a claim to accrue under Connecticut law

> [t]he harm to be alleged must have become actionable; that is, the plaintiff must have discovered all the essential elements of the cause of action it seeks to assert. In the present case ... there must have existed *actual injury* to the plaintiff School District, and the School District must have known that there was a causal connection between the conduct and the injury.

*Id.* at 1556 (emphasis added).

BellSouth contends that Judge Nevas ruled that a claim for asbestos abatement under the Connecticut Product Liability Act does not accrue until a plaintiff "may be charged with having knowledge of the asbestos hazard in its buildings *and of its responsibility for abatement."* *Id.* (emphasis added). We do not clearly understand from the opinion in *West Haven* whether the court believed that the cause of action did not accrue until the plaintiff knew (or should have known) of a present legal responsibility to abate (in addition to "tortious conduct on the part of the defendants, ... injury to the plaintiff" and knowledge of the "causal con-

nection between the conduct and the injury"). *Id.* at 1556. In our view, there is no requirement of a present legal duty to abate.

■ We predict that the Connecticut Supreme Court would follow its decisions in *Catz, Lambert* and *Burns* in determining when a claim accrues for asbestos abatement costs. We hold that a claim for asbestos abatement accrues under the Connecticut Product Liability Act when a plaintiff discovers, or should discover, actionable harm caused by an asbestos-containing product. Actionable harm, in the context of an abatement claim, occurs when the plaintiff has knowledge, or should have knowledge, of (i) actual contamination and (ii) the causal connection between the defendant's product and that contamination. In the instant case there is no dispute that BellSouth knew, or should have known, that any asbestos contamination was attributable to Grace's Monokote fireproofing.[6] We turn therefore to the district court's finding that BellSouth discovered actual asbestos contamination prior to January 19, 1990, and we consider whether any question of material fact defeats that finding.

### C. *Accrual of BellSouth's Claim.*

BellSouth poses two arguments in support of its position that its claim did not accrue until after 1990. First, BellSouth argues that prior to 1990 it suffered unactionable "economic loss" rather than actionable property damage. Second, BellSouth argues that, even if it suffered some form of property damage prior to 1990, it could not have brought a claim for building-wide abatement until 1992, when it learned of widespread asbestos contamination. We will address each of these arguments in turn.

#### 1. *Nature of Harm Prior to 1990.*

■ BellSouth argues that it suffered two successive and distinct injuries as a result of the presence of Monokote fireproofing in its building: (i) non-actionable economic loss resulting from the presence of asbestos, and (ii) actionable abatement damages caused by

---

**6.** BellSouth maintained records showing that Grace supplied it with Monokote fireproofing; in any event, BellSouth could have determined the supplier by analyzing samples of the fireproofing.

building-wide contamination. Up until 1992, BellSouth argues that it had only incurred additional maintenance costs resulting from the failure of Grace's product to meet Bell-South's economic expectations in terms of performance, and had taken merely "precautionary steps, designed to avoid the possibility of an artificially created hazard." Appellant's Br. at 14. This, according to BellSouth, is economic loss attributable to the mere presence of asbestos, not to property damage or personal injury, and thus not actionable under Connecticut law. *See* Conn.Gen.Stat.Ann. § 52–572m(d) (West 1995) (economic loss unactionable); *see also MDU Resources,* 14 F.3d at 1278–79 ("[M]ere discovery of asbestos is insufficient to begin the running of the statute of limitations."); *Adams–Arapahoe,* 959 F.2d at 872 ("[D]amage by virtue of the mere presence of [ACM] is not recoverable under Colorado tort law."); *San Francisco Unified Sch. Dist. v. W.R. Grace & Co.—Conn.,* 37 Cal.App.4th 1318, 1327 n. 5, 44 Cal.Rptr.2d 305, 310 n. 5 (1st Dist.1995) ("[T]he reduction of fair market value of buildings found to contain asbestos building materials may constitute an economic loss that cannot be recovered in tort...."). According to Bell-South, therefore, the costs that it incurred prior to 1992 (when it allegedly first learned that building-wide abatement was necessary) were merely higher-than-expected maintenance costs resulting from the failure of the Monokote fireproofing to meet the "general purposes for which it was manufactured and sold," and hence did not give rise to an actionable claim. *City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646, 650 (D.R.I.1986) (citation omitted).

We do not agree. We conclude that Bell-South suffered one continuing injury (not two distinct injuries) and that the injury was actionable as early as 1987. Our conclusion rests on two irrefutable facts.

First, it is undisputed that prior to 1990, BellSouth knew that portions of its building had become contaminated with asbestos and that the ACM in several locations had become friable. In September 1985, BellSouth learned from Law Engineering that there were "elevated, localized airborne asbestos fiber levels" on several floors of the Bell-South building. In April 1986, Bull & Kenney reported to BellSouth that it had found dangerously high levels of asbestos-containing dust and airborne asbestos fibers in the second-floor kitchen, in the twenty-ninth-floor mechanical room, and in the rooms containing the air-conditioning system, also on the twenty-ninth floor. Bull & Kenney also detected "fist-sized clumps" of ACM lying loose above acoustic ceiling tiles and light fixtures, indicating that as early as 1986 the ACM had dangerously deteriorated. Because the airborne asbestos posed a serious health threat to BellSouth employees, Bull & Kenney recommended complete abatement of these areas. Also in April 1986, BellSouth learned from McCrone Environmental Services that carpeting on several of its floors had become contaminated by asbestos. Bell-South has raised a genuine issue as to whether, prior to 1992, abatement or containment was the more prudent and practical means of dealing with the ACM, but BellSouth cannot dispute that it knew, prior to 1990, that the ACM in significant portions of its building had become friable, and that extensive areas had already become contaminated with airborne asbestos fibers.

BellSouth's internal memoranda confirm management's knowledge that its building had become contaminated and that building-wide abatement might become necessary. A November 3, 1986 memorandum from W.E. Reiser to Robert Geisler, safety manager at the headquarters building, recognized that abatement "someday will have to be undertaken in the Headquarters Building." A May 15, 1987 memorandum from vice-president Ferris to J.C. McPherson, the executive vice-president in charge of network planning, stated that the real estate department had "undertaken a more comprehensive analysis of removal versus continuing to live with [asbestos]." Ferris explained that "[s]ince [ACM] must be removed someday by someone, we feel it is necessary to fully understand our options ... and have a plan of action ready." An October 19, 1987 memorandum from Paul Elkourie, buildings & real estate engineer, to P.E. Bates, operations manager, and D.L. Chapman, manager for buildings and real estate, reported on a semi-

nar on asbestos abatement cost recovery litigation:

> My recommendation is that South Central Bell determine whether it is interested in recovering abatement costs [through litigation]. This should be done as soon as possible since there may be some statute of limitation considerations.
>
> If there is interest in recovery, I recommend the following actions be taken:
>
> 1. Our group have the ACM analyzed to determine the manufacturer. . . .
>
> 2. Legal Department have a paralegal research records to determine the manufacturer.
>
> 3. If the manufacturer can be determined and it is one that can still be sued, Legal should retain the services of attorneys specializing in asbestos cost recovery litigation.

This evidence unambiguously demonstrates that, by 1987, BellSouth's senior managers knew both that abatement was necessary (partial abatement, immediately; and total abatement, eventually), and that BellSouth had a cause of action against the manufacturer of the fireproofing for the abatement costs.

Second, BellSouth conducted several expensive abatement projects to control asbestos contamination in the period 1987 to 1990, expenditures that were recoverable under the Connecticut statute. In 1987, BellSouth undertook complete asbestos abatement of the stairwells, janitors' closets, kitchen and cafeteria, rest rooms, carpeting, and ceiling tile, at a cost of approximately $365,000. Also in 1987, BellSouth re-upholstered furniture and fabric-covered partitions that had become contaminated with asbestos at an unspecified cost. By August 1988, BellSouth had removed all asbestos-containing piping insulation and installed a respirator system on every floor for use by contractors during routine maintenance. By the end of that year, BellSouth had commenced complete abatement of the first and second floors and abatement of the electrical, telephone and riser closets on the twenty-ninth and thirti-

eth floors, and proposed the installation of a building-wide hazardous waste vacuum system. Abatement costs between 1987 and 1990 exceeded $1.2 million, and reached $850,000 in 1988 alone.[7] This undisputed evidence mandates the conclusion that, prior to 1990, there was asbestos contamination in BellSouth's building; that BellSouth suffered actual property damage—not just economic loss—as a result of this contamination; and therefore that as early as 1987 BellSouth could have brought an action against Grace for at least partial abatement.

In mistaken reliance upon the *West Haven* decision, BellSouth argues that at the time it took the above-described limited remedial actions it did not have a "responsibility" to abate. According to BellSouth, these abatement steps were taken only because these areas of the building were being renovated, and because, under federal regulation, asbestos must be completely abated when any major renovations or remodeling takes place. *See* 40 C.F.R. § 61.145 (1995) (requiring friable ACM be removed during renovation). But this argument proves too much: the elective character of the renovations does not obviate the fact that, by undertaking them, BellSouth incurred a federally mandated responsibility to abate. *See MDU Resources Group v. W.R. Grace & Co.*, 14 F.3d 1274, 1279 n. 8 (8th Cir.) ("If, for example, MDU expanded or remodeled its building between May of 1980 and six years before filing suit, such remodeling could trigger abatement costs and would begin running the statute of limitations."), *cert. denied,* — U.S. —, 115 S.Ct. 89, 130 L.Ed.2d 40 (1994).

### 2. Discovery of Building–Wide Contamination in 1992.

■ BellSouth next urges that its present claim for *building-wide* abatement could not have been brought prior to 1992 because damages would have been too speculative to recover. *See Cruden v. Bank of New York,* 957 F.2d 961, 977 (2d Cir.1992) (plaintiff cannot show injury, and thus does not have an

---

7. BellSouth evidently continued its policy of abating areas that contained high levels of airborne asbestos fibers and asbestos dust, because total costs of limited abatement efforts exceeded $2 million by January 1994.

actionable claim, "where the damages arising from defendant's conduct are speculative or their amount and nature unprovable"). Bell-South contends that, even if management had been aware prior to 1990 that building-wide abatement would ultimately become necessary, such awareness of a potential claim would not have furnished a cause of action for building-wide abatement because actual injury had not yet occurred. Bell-South argues strenuously that it should not be charged with discovery of its injury until December 1992, when it knew with certainty that top-to-bottom abatement was immediately necessary.

Essentially, BellSouth argues that a claim does not accrue under a discovery statute of limitations until the plaintiff appreciates that the ultimate loss is or will be of a kind and magnitude that justifies a lawsuit. There is merit in this skillfully presented argument. But the speculative character of BellSouth's abatement claim is not different in kind from personal injury recoveries that include the cost (as well as the pain and suffering) associated with future medical procedures. *See Seymour v. Carcia*, 221 Conn. 473, 478, 604 A.2d 1304, 1306 (1992). BellSouth's theory of claim accrual, if adopted, would vitiate all discovery statutes of limitation. *See Roseville Plaza Ltd. Partnership v. United States Gypsum Co.*, 811 F.Supp. 1200, 1208 (E.D.Mich.1992) (accepting plaintiff's position would "postpone accrual until a time of plaintiff's own choosing"), *aff'd*, 31 F.3d 397 (6th Cir.1994).

In any event, BellSouth's argument in this respect is conceptually foreclosed by the Connecticut Supreme Court's observations concerning the accrual of claims in *Burns v. Hartford Hosp.*, 192 Conn. 451, 472 A.2d 1257 (1984). In that case a child's leg became infected as the result of a hospital's negligence. Compounding that negligence, the child's physician mistakenly reassured the child's mother that the infection would not result in permanent damage. In fact, the infection left permanent scar tissue, and the scar tissue ultimately restricted the child's

use of his leg. Although the permanent character of the damage did not become apparent until nearly three years later, when the child filed suit against the hospital and doctor, the claim was held time-barred by Connecticut's two-year statute of limitations for malpractice claims. The court ruled that "injury is first sustained" under that statute of limitations "when a party suffers *some form of actionable harm*. The harm need not have reached its fullest manifestation before the statute begins to run." 192 Conn. at 460, 472 A.2d at 1261 (emphasis added). Actionable harm was held to have accrued when "some form" of injury was discovered, even though the permanent nature of the injury was not known until well after the initial malpractice was first discovered. *Id.; see also Lambert v. Stovell*, 205 Conn. 1, 7, 529 A.2d 710, 713 (1987) (claim accrued when plaintiff was "aware of circumstances indicating that he had suffered a form of 'actionable harm' and should have discovered his injury at that time").

We have applied this principle of Connecticut law in the malpractice context: "Under Connecticut law ... 'the statute [of limitations] begins to run when the plaintiff discovers *some form* of actionable harm, not the fullest manifestation thereof.'" *Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d Cir.1992) (quoting *Lambert v. Stovell*, 205 Conn. 1, 6, 529 A.2d 710, 713 (1987) (emphasis in original)). Since BellSouth could have brought a claim for partial abatement as early as 1987 (as we have decided, *supra* at 1673–1677), BellSouth suffered "some form of actionable harm" prior to 1990. Bell-South's contention that it suffered two separate and distinct injuries—economic injury arising from the disappointing performance of the Monokote product prior to 1992, and actionable property damage thenceforward—is artificial and unsustainable in light of the undisputed facts. The widespread contamination documented in 1992 was a further manifestation of the previously discovered asbestos contamination, not a second injury.[8]

---

8. For statute of limitations purposes, it does not matter that (as it appears) BellSouth first learned from the 1992 Law Associates report that complete abatement had become necessary. That report merely confirmed management's earlier expectation that the ACM would have to be completely removed eventually. As the Connecticut Supreme Court has stated, "[a]lthough an expert

Like the injured plaintiff in *Burns,* BellSouth cannot persuasively argue that its claim for abatement did not accrue because its first injury was dwarfed by the ultimate loss. Under Connecticut law, the accrual of claims does not depend on the magnitude of the injury; recall that the plaintiff in *Burns* suffered first from only a minor infection. In any event, we do not think that claims in six and seven figures would be deemed beneath notice.

No genuine issue of material fact subverts the district court's conclusion that BellSouth had discovered all the essential elements of a cause of action for abatement under Conn. Gen.Stat. § 52–572M to –572N prior to January 19, 1990. We therefore hold that the district court properly granted Grace's motion for summary judgment dismissing BellSouth's claim as time-barred.

### D. *BellSouth's Other Claims.*

 Under Connecticut law, a statute of limitations is tolled if the tortfeasor "fraudulently conceals from [the victim] the existence of the cause of such action." Conn. Gen.Stat.Ann. § 52–595. BellSouth argues that W.R. Grace participated in an industry association that disseminated publications urging building owners to pursue containment rather than abatement, and that W.R. Grace thereby actively concealed the fact that abatement would ultimately be necessary. For that reason, BellSouth contends that the statute of limitations should be tolled under Connecticut law. In order to benefit from this kind of tolling argument, however, "a plaintiff must show that: (1) he was ignorant of the right of action; (2) the defendant intended that he be kept in ignorance; and (3) ... the defendant was guilty of some affirmative act of concealment." *Hamilton v. Smith,* 773 F.2d 461, 468 (2d Cir.1985). We have already determined that BellSouth was unquestionably aware of the essential elements of its cause of action prior to January 19, 1990.

opinion may lead to discovery of an 'actionable harm'; it does not follow that a plaintiff cannot reasonably discover an injury absent verification by a qualified expert." *Barnes v. Schlein,* 192 Conn. 732, 737 n. 7, 473 A.2d 1221, 1224 n. 7

 BellSouth next asserts that findings adopted by the district court erroneously discounted affidavits in which BellSouth executives disclaimed knowledge of the essential elements of BellSouth's claim. The magistrate judge had characterized these recitations of the affiants' mental state as merely "self-serving conclusions." Under well-settled law, the magistrate judge's treatment of BellSouth's evidence and affidavits was proper because the affiants' statements advocated conclusions of law. "[A]n adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion [for summary judgment] must set forth 'concrete particulars.' ... It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts...." *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). *See also Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). In addition, "ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 486 & 489 (1983); *see also* Fed. R.Civ.P. 56(e). Such conclusory statements are insufficient to raise a triable issue of material fact, and hence were properly disregarded.

Last, BellSouth argues that rigid application of § 52–577a(a) is inequitable because it could not have asserted its claim for total abatement prior to the date on which that claim has been held to have become time-barred. If § 52–577a(a) is applied to bar its abatement claim, BellSouth contends, its $85 million claim will have gone directly from being premature to being time-barred.

We are not persuaded. As we have already determined, BellSouth *could* have maintained a claim for abatement against W.R. Grace prior to 1990. Thus BellSouth's position is less compelling than the position

(1984) (citation omitted); *see also Gnazzo,* 973 F.2d at 138–39 (harm discovered when plaintiff suspected causal link, not when expert told her of causal link ten years later).

of the plaintiff in *Burns*, whose appeal went unheeded in the Connecticut Supreme Court:

Unfortunately, the unavoidable result we reach in this case is harsh. The plaintiff may very well be foreclosed from any remedy for what might have been an actionable injury. But it is within the General Assembly's constitutional authority to decide when claims for injury are to be brought.... Where a plaintiff has failed to comply with [the statutory] requirement, a court may not entertain the suit.

*Burns*, 192 Conn. at 460, 472 A.2d at 1261 (citation omitted).

## CONCLUSION

For the reasons set forth above, the decision of the district court is affirmed.