Christopher DOUGLAS, Plaintiff,

v.

DISTRICT COUNCIL 37 MUNICIPAL EMPLOYEES' EDUCATION FUND TRUST, Defendant.

No. 01 CIV 3191(VM).

United States District Court, S.D. New York.

June 27, 2002.

Roger V. Archibald, Brooklyn, NY, for Christopher Douglas, plaintiff.

Katherine C. Glynn, Robinson & Cole LLP, New York City, for District Council 37, defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Christopher Douglas ("Douglas") brought this action against his former employer, District Council 37 Municipal Employees' Education Fund Trust (the "Fund"), alleging the Fund terminated his employment in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621–34, the New York State Human Rights Law, N.Y. Exec. Law § 296 (2001), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 (the State and City statutes are herein collectively referred to as the "HRLs"). The Fund moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Fund's motion is granted.

## I. FACTS [1]

In late August or early September, 1998, Douglas replied to the Fund's advertisement for the managerial position of Associate Administrator. The job required, among other things, supervision of staff, administration of education benefits, preparation of grant applications and budget monitoring, and implementation and supervision of education programs. On September 8, 1998, Douglas filled out the Fund's employment application (the "Ap-

---

1. The factual recitation herein derives primarily from the parties' statement of material facts submitted pursuant to Local Civil Rule 56.1. *See* Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Def.'s 56.1 Statement"); Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment Pursuant to Rule 56.1 ("Pl.'s 56.1 Statement").

plication"), which asked for information, such as the applicant's employment history, and specifically requested the identity of his last three employers and reasons for leaving their employ.

On the Application, Douglas stated that his sole reason for leaving his most recent employer, SUNY Health Science Center ("SUNY"), was that the grant that funded his program was not renewed. While there is some dispute as to whether or not Douglas's grant was renewed, there is no question that Douglas left SUNY at least in part because he was terminated for under-performance of his job duties. Douglas failed to disclose on the Application that SUNY had terminated him. Douglas also stated on the Application that he had been employed by SUNY from 1996 through 1998, when in fact he had only been with SUNY for six months during 1997. At the same time, Douglas submitted a resume containing the correct dates of his SUNY employment.

Douglas did not disclose on the Application that he was fired from another previous employer, Apple, Inc. ("Apple"). Douglas argues that he did not purposely omit this information from the Application, but that he provided the requested information for his three previous employers in the space available. Furthermore, Apple was not one of Douglas's prior three employers.

Based in part on the information Douglas provided in the Application, Barbara Kairson ("Kairson"), Administrator of the Fund and Douglas's direct supervisor, hired him as Associate Administrator.

Douglas's first four months with the Fund were uneventful, as recorded in a January 8, 1999 memorandum (the "January Memorandum") of Douglas's job performance that Kairson prepared. Kairson commended Douglas in many respects and critiqued him in others.[2]

During the remainder of Douglas's tenure with the Fund he experienced difficulties that culminated in his termination in October 2000. The Fund provided documentation of the following specific examples.

According to the Fund, in the Spring of 1999, Douglas engaged in a screaming match with another Fund employee, Chandler Henderson ("Henderson"). While Douglas denies this encounter ever happened, another Fund employee, Ken Sherman ("Sherman"), corroborating Henderson's statement that the event occurred, attested that he witnessed Douglas and Henderson involved in a "very intense argument."[3] (*See* Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Reply"), at Ex. 3.)

Sometime in 1999, Douglas made a presentation to various high-level persons as-

---

2. The January Memorandum to Douglas included the following: "Your attendance and punctuality are excellent;" "I observe your energetic outreach to several program units;" "Your ability to communicate with a variety of individuals within the department has been positively observed." But, on the negative side, Kairson also commented: "[Y]our outreach activity has diminished;" "I would expect in the coming months to see a more proactive approach;" "I have been informed on a few occasions that you have been perceived as curt when speaking with some peo-

ple on the telephone." (*See* Pl.'s 56.1 Statement, at Ex. 2.)

3. In his defense, Douglas provides an affidavit of a coworker, George Zaitz ("Zaitz"). (*See* Pl.'s 56.1 Statement, at Ex. 5.) Zaitz, a Fund accountant during Douglas's tenure, worked with Douglas four to six times per month and claims that he never observed Douglas address colleagues in an unprofessional manner. However, Zaitz was not present at the alleged screaming match involving Douglas and Henderson.

sociated with the Fund, including union presidents, at a training session on parliamentary procedure. During the presentation, Douglas commented upon the performance and actions of a union president associated with the Fund, which certain members of the Fund, including Kairson, deemed an unfair and unprofessional open criticism of that union president. Douglas asserts that he used the union president's experience as a positive example.

In late Spring, 2000, a staff associate who reported directly to Douglas, Jacqueline Moses–Noble ("Noble"), began misappropriating funds from the Summer Activities Program (the "Summer Program"), which she administered. In administering the Summer Program, Noble was required to collect payments—in the form of money orders because cash payments were discouraged—from persons who wished to participate in the program. Noble embezzled $4,100.00 from the Summer Program by issuing false receipts, collecting cash payments, and altering money orders. Douglas, as Noble's supervisor, was responsible for reviewing, on a daily basis, her accounting forms and the money Noble collected for the Summer Program. After a coworker, Sherman, noticed a discrepancy between the money collected and the registration forms for the Summer Program, Kairson reviewed Noble's work and exposed her wrongdoing.[4] Noble was fired on July 3, 2000.

The Fund suspected that Douglas played a role in Noble's theft, although it had no clear evidence of Douglas's guilt. The Fund had noted that Noble had spent considerable time in Douglas's office, late into the night. During discovery, it was revealed that Noble had called Douglas's home 147 times between May 25, 2000 and June 20, 2000, oftentimes after midnight. This documentation contradicted Douglas's sworn deposition testimony that he and Noble never telephoned one another at home. Nevertheless, given the totality of the circumstances, the Fund takes the position that either Douglas was an incompetent manager who failed to uncover his direct subordinate's misdeeds, or that Douglas played a contributory role in Noble's embezzlement scheme.

Douglas contends that he was not part of Noble's impropriety and that he never noticed any discrepancy in her administration of the Summer Program. Moreover, Douglas argues that while Noble was his direct subordinate, she also had a personal and professional relationship with Kairson for whom she worked before Kairson was promoted to her current position. Thus, Douglas alleges that Kairson is equally responsible for Noble's misdeeds. Douglas provides no explanation for his failure to become aware of or expose Noble's misdealings even though she reported directly to him on a daily basis.

In early June 2000, Douglas attended a work-related conference in Philadelphia, Pennsylvania. While sitting at a table amongst various Fund employees, including Kairson and Joan Reed ("Reed"), pres-

---

**4.** Sherman became suspicious of Noble's dealings after he reviewed the Summer Program's records and discovered the money collected was $20.00 short. Sherman questioned Noble about the shortfall and she said that Douglas had the missing money. Sherman asked Douglas if he had the missing $20.00 and Douglas took the missing money, in cash, out of his desk drawer and handed it over to Sherman. Douglas's possession of $20.00 cash in his desk drawer, which further aroused Sherman's suspicions, prompted Kairson's review. Douglas does not dispute that he possessed the $20.00 cash in his desk drawer. Rather, he justifies his actions by alleging that he was holding the money for an employee, Ms. Buchanan ("Buchanan"), who had paid, and received a receipt from Noble, for the Summer Program in cash to hold her spot while she obtained a money order.

ident of a Local and an employee of the Fund, Douglas made a comment deemed anti-Semitic. Describing his experience in the jewelry trade, he said that in one particular transaction he had "jew[ed] someone down." Reed was particularly upset by the comment and complained to Kairson. Subsequently, as punishment for this incident, Douglas was suspended for two weeks without pay. Douglas justifies his conduct by claiming that he immediately apologized to Reed via telephone and followed up with a letter of apology, and also that he meant no harm by the comment.

In a July 25, 2000 memorandum (the "July Memorandum") from Kairson to Douglas, Douglas was reprimanded for various reasons. Kairson admonished Douglas for his consistent tardiness, for his failure to consult with her regarding a summer project Douglas had spearheaded and which ultimately led to its demise, for his scheduling of personal appointments during working hours, and for his presence in the office long after working hours. In his affidavit and 56.1 Statement, Douglas denies all of the allegations contained in the July Memorandum.

Finally, on October 2, 2000, Kairson advised Douglas that he should resign or be terminated.[5] The following day, Douglas met with Ramsey (the "Ramsey Meeting") to discuss the Fund's decision to fire him. On October 4, 2000, Douglas sent a letter to Ramsey (the "October Letter"), purporting to memorialize the content of their meeting the previous day. In the October Letter, Douglas claimed that Ramsey advised him that he was being terminated because he was the "fall guy" for Noble's

theft and for a mistake he had made in an advertising project for the Summer Program.

Douglas filed a claim with the federal Equal Employment Opportunity Commission (the "EEOC") roughly two weeks after his conversation with Ramsey. Upon dismissal of the EEOC claim, Douglas filed an ADEA suit in a timely manner with this Court alleging that he was fired by the Fund because of his age, in violation of the ADEA. Douglas bases his claim on three alleged comments made by three Fund employees referencing his age.

First, Douglas claims a secretary at the Fund, whose name he does not recall, told him, "[t]hat is what happens when you get old, you lose your hair" (the "Secretary's Comment"). (See Def.'s 56.1 Statement, at Ex. D.) Douglas is unable to provide the specific context within which the Secretary's Comment was made, nor the date of the alleged comment. Second, Douglas claims that during the Ramsey Meeting, Ramsey told Douglas that he was being terminated because "[s]omebody has to be the fall guy. You are the oldest one" (the "Ramsey Comment"). This allegation finds no support in Douglas's October Letter or his Response to Defendant's First Set of Interrogatories ("Douglas's Response to Interrogatories"), neither of which reference the Ramsey Comment.

Finally, Douglas alleges that just prior to his employment with the Fund, he was introduced to Ramsey and Saunders, who at that time was not yet Executive Director of District Council 37. On that occasion, Saunders allegedly asked him, "[w]hy would someone at this point in their career or someone of your standing want

---

5. The parties dispute who was ultimately responsible for deciding to terminate Douglas. The Fund claims that Kairson made all hiring and firing decisions and that she decided to terminate Douglas. Douglas alleges that Lee

Saunders ("Saunders"), Executive Director of District Council 37, and Zach Ramsey ("Ramsey"), the Chairman of the Board of Trustees of the Fund, were responsible for his termination.

to come here?" (the "Saunders Comment"). Saunders and Ramsey deny the comment was made; Ramsey remembers that in this particular conversation somebody asked why Douglas would want to work for District Council 37, which at the time was mired in a scandal over certain former employees' illegal dealings. Douglas believes these three comments alone are sufficient to show he was discriminated against based on his age.

## II.  *DISCUSSION*

### A.  *STANDARD OF REVIEW*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of showing that no genuine issue of material fact exists rests on the party making the motion—here, the Fund. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Mark v. Mount Sinai Hosp.,* 85 F.Supp.2d 252, 256 (S.D.N.Y. 2000) (citing to *Ametex Fabrics, Inc. v. Just In Materials, Inc.,* 140 F.3d 101, 107 (2d Cir.1998)).

The mere existence of a factual dispute between parties does not preclude summary judgment when the dispute is not genuine or when the disputed facts are immaterial. *Id.* A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a rational jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party is required to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)). Finally, a party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

Summary judgment is appropriate even in discrimination cases, for "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). In employment discrimination cases, courts are particularly cautious about granting summary judgment where intent is at issue. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). Moreover, "because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2nd Cir.1994)). However, even in these cases a "plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp,* 118 F.3d at 110.

## B. *QUESTIONS OF FACT*

■ The parties have spent considerable time and effort debating certain events and facts involved in their dispute. Those issues include: (1) whether Douglas purposely misstated the dates of his SUNY employment on the Application; (2) whether Douglas's SUNY grant was renewed; (3) whether Douglas was required to disclose his employment history with Apple on the Application; (4) whether Kairson or a combination of Ramsey and Saunders was ultimately responsible for the decision to fire Douglas; (5) whether Douglas engaged in a "screaming match" with Henderson; and (6) whether Douglas's comment about the union president was a "criticism" or a "compliment."

■ The Court recognizes that the parties present sharply contrasting versions of these events. In considering a motion for summary judgment, however, the question for the Court is not whether the parties are divided, but whether their differences entail genuine issues of material fact that can affect the legal outcome of the action. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

Here, the factual issues Douglas strenuously contests are irrelevant, and immaterial, because they will not affect the disposition of this case, given the underlying substantive law compelled by the *McDonnell Douglas* test, discussed in depth below. Thus, the foregoing issues need not be resolved as they have no bearing on the Court's decision. *See Mark,* 85 F.Supp.2d

at 256 (noting that the mere existence of a factual dispute between parties does not preclude summary judgment when the dispute is not genuine or when the disputed facts are immaterial). Also, "if the undisputed facts reveal that there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to other elements becomes immaterial and cannot defeat the motion." *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996).

## C. *DOUGLAS'S EMPLOYMENT DISCRIMINATION CLAIM*

■ To survive summary judgment on his age discrimination claim, Douglas must either produce "direct evidence" of discrimination, or establish discrimination by inference through the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Woroski v. Nashua,* 31 F.3d 105, 108 (2d Cir.1994). As Douglas has not presented "direct evidence" of discrimination, his claim will be analyzed under the *McDonnell Douglas* test.[6]

To state a sufficient ADEA claim under *McDonnell Douglas,* the plaintiff has the initial burden of establishing a *prima facie* case of unlawful age discrimination by showing: "(1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1155 (2d Cir.1993); *see St. Mary's*

---

**6.** Identical standards apply to employment discrimination claims brought under the ADEA and the HRLs. *See Weinstock v. Colum-* *bia Univ.,* 224 F.3d at 42; *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir. 1992).

*Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Making a prima facie case is not onerous; the plaintiff's burden is *de minimis. See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. If the plaintiff successfully states a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Finally, if the employer articulates such a reason, the burden shifts back to the plaintiff to show that the "employer's proffered reasons are ... a pretext for discrimination." *Austin v. Ford Models, Inc.,* 149 F.3d 148, 153 (2d Cir.1998).

Douglas satisfies the first prong of the age discrimination *prima facie* case. He was within a protected class defined by age group because he was sixty years old at the time he was terminated. Further, Douglas satisfies the third prong: he was discharged by the Fund from his employment in October 2000. However, in this Court's analysis of the record before it, Douglas fails to satisfy the second and fourth prongs of the *prima facie* case. He is unable to demonstrate that he was qualified for the position of Associate Administrator when he was terminated and to support any inference of age discrimination as the basis for his discharge.

### 1. *Qualification for the Position*

■ To satisfy the second element of the *McDonnell Douglas* test, Douglas "need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he 'possesses the basic skills necessary for the performance of [the] job.'" *S. de la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2d Cir.1996) (quoting *Powell v. Syracuse Univ.,* 580 F.2d

1150, 1155 (2d Cir.1978), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978)). Douglas "must offer *some evidence* from which a reasonable fact-finder could conclude that [he] was qualified for [his] position." *Ricks v. Conde Nast Publications, Inc.,* 92 F.Supp.2d 338, 346–47 (S.D.N.Y.2000) (emphasis added).

Douglas is unable to show that he was qualified for the position of Associate Administrator, even under the applicable *de minimis* burden. As Associate Administrator, Douglas was second in command of a unit that employed between forty and forty-five individuals. The "basic skills necessary" for the position of Associate Administrator, as documented in the Fund's employment advertisement, included supervision of staff, administration of education benefits, preparation of grant applications and budget monitoring, and implementation and supervision of education programs. The Fund has produced substantial evidence indicating that Douglas's performance, during his tenure with the Fund and in his prior employment experiences, bespeaks of his inability to effectively function as a high-level manager. Douglas was fired by two previous employers, within a four year period, for inability to perform effectively the essential job functions of similar high-level managerial positions. In addition, his less than forthright response on the Application to the question of the reasons for his leaving his most recent employment, failing to reveal that he was fired, calls into question Douglas's judgment and candor. The Fund understandably points out that had Douglas not equivocated about or withheld this vital detail of his employment history, it would have been apprised sooner of his managerial shortcomings and may not have hired him for a high-level managerial position required some of the very skills his prior termination evidenced he lacked.

The Court is not persuaded by Douglas's argument that technically he did not "lie" on the Application by not disclosing the circumstances of his termination from SUNY. Douglas argues that, on the Application, he stated that he left SUNY due to the non-renewal of a grant for his program, which he claims was also true. Nevertheless, in responding to a question asking to explain the circumstances for his leaving a particular job, Douglas's simple assertion that the funding expired, and thus, failure to disclose that he was actually fired by SUNY, is not only deliberately misleading, but tantamount to falsehood, however subtle the gloss of semantics or technicalities employed to mask the reality.

Douglas's performance as an employee of the Fund provides more compelling evidence supporting the Fund's contention that he was unqualified to be Associate Administrator. The Fund documented numerous instances of Douglas's failure as a manager. Two undisputed events particularly influence the Court's determination that Douglas has failed to satisfy the qualification element of his prima facie case. The first is Douglas's anti-Semitic comment, which he does not dispute he made at a business function attended by various company dignitaries. The second event is Douglas's failure to account for, and prevent, the embezzlement by his direct subordinate, Noble. In addition, the July Memorandum documents Douglas's persistent tardiness, his inability to effectively administer a program which led to its demise, his scheduling of appointments during working hours, and his insufficiently explained late nights in the office long after working hours.

Douglas simply denies most of the Funds allegations, including the incidents documented in the July Memorandum, without providing specific factual explana-tions for the memoranda, deposition testimony, and affidavits to the contrary. The only evidence Douglas provides to support his managerial abilities is: (1) the positive aspects of the January Memorandum, which can at best be characterized as satisfactory, relates only to his first three months with the Fund, and does contain references that portend the performance flaws that later materialized into disqualifying problems; (2) the Zaitz Affidavit, which is of little value considering Zaitz worked with Douglas only four to six times per month and only attests by negative inference to circumstances he did not observe; and (3) his own affidavit denying most of the Fund's documented evidence.

To defeat a summary judgment motion "that is properly supported by affidavits, depositions, and documents as envisioned by Fed.R.Civ.P. 56(e), [Douglas] is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb*, 84 F.3d at 518. Douglas "cannot defeat the motion by relying on allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.* Moreover, even if Douglas's submission and denials were assigned some weight, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

Thus, given the well documented evidence relating to: (1) Douglas's prior employment history; (2) his equivocal submission of information on the Application; (3) his anti-Semitic comment made at a company function; and (4) his failure to account for, and prevent, the embezzlement by his direct subordinate, the Court finds that no rational trier of fact could reasonably conclude that Douglas has established

that he was qualified for the position of Associate Administrator. As a matter of law, therefore, Douglas is unable to satisfy the second prong of *McDonnell Douglas.* Consequently, his age discrimination claim necessarily fails.

### 2. *Inference of Discrimination*

■ Even were the Court to find that Douglas met the qualification element of his prima facie case, the Court is not persuaded that he has satisfied the fourth prong of *McDonnell Douglas:* that his discharge occurred under circumstances giving rise to an inference of discrimination. Douglas relies on the Secretary's Comment, the Ramsey Comment, and the Saunders Comment to meet his burden of proving he was dismissed under circumstances giving rise to an inference of discrimination.

These three alleged comments are insufficient to create an inference of age discrimination. First, Douglas is unable to provide the Court with the context within which the Secretary's and Saunders Comments were made. "Stray" comments do not raise an inference of discrimination. *See Ranieri v. Highland Falls–Fort Montgomery Sch. Dist.,* 198 F.Supp.2d 542, 545 (S.D.N.Y. April 18, 2002) (citing *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 668 (W.D.N.Y.1992), *aff'd,* 995 F.2d 1147 (2d Cir.1993) ("Isolated and ambiguous statements are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination")). Here, the Secretary's and Saunders Comments fall "well within the parameters of 'ambiguous' and 'abstract.' " *Ranieri,* 198 F.Supp.2d at 545. As such, the Secretary's and Saunders Comments do not raise an inference of discrimination.

Second, Douglas's Response to Interrogatories and the October Letter discredit Douglas's Affidavit regarding the Ramsey Comment. In Douglas's Response to Interrogatories, he stated, "Zach Ramsey, in sum and substance [sic]' specifically stated to plaintiff that 'he (plaintiff) had to be the fall guy for the monies embezzled by Jackie [Noble].' " In this account of the conversation there is no mention whatsoever of any age-based comment. In addition, the October Letter does not address the Ramsey Comment, rather, Douglas wrote to Ramsey, "you told me I was the 'fall guy' for years of neglect and or oversight ..." Given Douglas's Response to Interrogatories and the October Letter, the Court discounts Douglas's assertion that the Ramsey Comment was made. *See F. Mancuso v. Consol. Edison Co. of N.Y., Inc.,* 130 F.Supp.2d 584, 592 (S.D.N.Y. 2001) ("factual assertions made in an affidavit submitted in opposition to a motion for summary judgment may be disregarded if those assertions are contradicted by statements in response to interrogatories").

■ Moreover, assuming the validity of the Ramsey Comment, "one statement over the course of [Douglas's] employment is insufficient as a matter of law to support an inference of discrimination." *Clay v. N.Y. Nat'l Bank,* No. 99 Civ. 9857, 2001 WL 277299, at *1 n. 3 (S.D.N.Y. March 21, 2001) (citing *Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994)). Also, the Court notes that Douglas was hired at the age of fifty-eight, eighteen years within the protection of the ADEA, which weakens any inference of age discrimination surrounding his discharge. *See James v. N.Y. Racing Assoc.,* 76 F.Supp.2d 250, 255 (E.D.N.Y.1999).

Finally, had Douglas satisfied his burden of establishing a *prima facie* case of discrimination, the Court nonetheless finds on the record before it that the Fund provided a plethora of legitimate, non-discriminatory reasons for his termination,

and that Douglas has presented no concrete evidence to establish that the Fund's stated grounds were pretextual.

## III. *ORDER*

For the reasons documented above, it is hereby

ORDERED that the Fund's Motion for Summary Judgment be GRANTED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**