Donna MUHLEISEN, Plaintiff,

v.

**WEAR ME APPAREL
LLC, Defendant.**

**No. 07 Civ. 8748(NRB).**

United States District Court,
S.D. New York.

July 30, 2009.

Paul R. Castronovo, Bedminster, NJ, for Plaintiff.

Michael Peter Pappas, Sara Danielle Sheinkin, Littler Mendelson, P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Donna Muhleisen brings this lawsuit against her former employer, defendant Wear Me Apparel LLC, asserting claims of: "Sex and Pregnancy Discrimination" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; "Sex Discrimination" in violation of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-107(1), (6); and "Retaliation" in violation of the Family Medical Leave Act ("FMLA"),

29 U.S.C. § 2601 *et seq.* Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Briefly stated, we find that plaintiff has presented no evidence that would lead a reasonable juror to conclude that plaintiff's termination was motivated by gender or pregnancy discrimination, or that defendant's proffered reason for plaintiff's termination—poor job performance—was pretextual. In opposing the instant motion, plaintiff rests her claim on defendant's decision to wait several months after her termination to eliminate the positions of two other poor performers, along with some ambiguous, stray remarks that plaintiff contends are evidence of discriminatory animus against her, but that were made by an individual who had, at most, tangential involvement in the decision to fire her. Such a meager showing is insufficient at this postdiscovery stage of the litigation. Accordingly, and because plaintiff has failed to demonstrate that there exists a genuine and triable issue of material fact in this case, defendant's motion for summary judgment is granted. The opinion below addresses in greater detail the legal and factual underpinnings of this ruling.

## BACKGROUND [1]

### Defendant hires plaintiff

Defendant is a manufacturer and distributor of children's apparel. (DSF ¶ 6.) In 2005, defendant purchased certain assets of another manufacturer and distributor of children's apparel called Happy Kids, Inc., which had filed for bankruptcy. (*Id.* ¶¶ 1, 7.) Among the assets defendant

---

**1.** The following facts are drawn from the Defendant's Rule 56.1 Statement of Facts ("DSF"), the Plaintiff's Responding Statement of Material Facts ("PRSF") and the Plaintiff's Statement of Additional Material Facts ("PSAF"), as well as from the documents and deposition transcripts cited in support of those statements.

acquired through that purchase was a children's apparel line called "And–1," for which plaintiff had been the head of sales since 1996. (*Id.* ¶ 7; PSAF ¶ 1.) At the time of the purchase, Jason Rabin, a co-owner of defendant in charge of defendant's sales organization, personally offered plaintiff a job as head of the And–1 line. (DSF ¶ 11.) Plaintiff—who was on maternity leave at the time of the offer—requested that defendant provide her with a four-day workweek, and Rabin agreed.[2] (DSF ¶¶ 9, 12, 14.) Plaintiff began her employment at defendant as "vice president of sales for And–1" in December 2005 or January 2006.[3] (*Id.* ¶ 16; PRSF ¶ 9.) Defendant also hired two other former Happy Kids, Inc. employees—Steven Lee, head of the Calvin Klein line, and Mary Ellen Geoghan, head of the Izod line. (DSF ¶¶ 4–5, 10.)

### Defendant hires Murray

Business conditions at defendant and in the apparel industry more generally began to decline in 2005, and they continued to worsen in 2006 and 2007. (DSF ¶ 24.) In or about June 2006, defendant hired Ronald Murray as senior vice president of sales, planning and budget administration. (*Id.* ¶ 21.) Rabin hired Murray to manage defendant's sales organization and to supervise directly the company's division heads for the various apparel lines.[4] (*Id.* ¶ 22.) Rabin also tasked Murray with restructuring and streamlining defendant's sales organization. (*Id.* ¶ 25.) Murray told Rabin that he believed defendant was employing too many division heads—sixteen at the time he was hired—and carrying too much overhead. (*Id.* ¶¶ 26, 27.) Murray believed that having fewer division heads would not only reduce overhead, but also allow for faster and more efficient decisionmaking. (*Id.* ¶ 27.) Accordingly, he recommended to Rabin that some of the existing apparel divisions be consolidated and the number of division heads be significantly reduced. (*Id.* ¶ 28.)

### Plaintiff is fired

In or about the summer of 2006, plaintiff informed Rabin that she was pregnant with her third child and that she was due in February 2007. (June 11, 2008 Deposition of Donna Muhleisen ("Pl. Dep.") at 248, 275.) Plaintiff testified that Rabin seemed "more shocked than anything" by the news "because I had had another baby, you know, six months prior to that." (*Id.* at 249–50.) In the months that followed, plaintiff informed others about her pregnancy, including Murray, who congratulated her. (*Id.* at 250–51.) On January 3, 2007, approximately three weeks before she went on maternity leave, plaintiff discussed her upcoming leave with Arthur Rabin, defendant's chairman and co-owner (and Jason Rabin's father). (*Id.* at 268.) Plaintiff testified that during a discussion regarding recent problems with the timing of deliveries in plaintiff's division:

> [Arthur Rabin] just kind of interrupted the conversation and just said, you know, didn't you just have—didn't you

---

2. Defendant claims that it gave plaintiff a salary increase from the $180,000 salary she received at Happy Kids, Inc. to $250,000 with a $100,000 annual bonus. (DSF ¶ 15.) Plaintiff asserts that defendant "slashed Plaintiff's annual compensation from approximately $405,000 to a base salary of $250,000 with a $100,000 bonus." (PRSF ¶ 14.) Of course, these statements are not necessarily mutually exclusive.

3. Plaintiff's precise starting date is apparently in dispute. (*See* DSF ¶ 16; PRSF ¶ 16.)

4. Plaintiff states that she and the other division heads reported to Murray, who himself reported to Rabin. (PRSF ¶ 23.) Defendant asserts that plaintiff and the other division heads reported to *both* Rabin and Murray, although Murray himself reported to Rabin. (DSF ¶ 23.)

just have a baby; when is this one coming. When are you going to have another baby; when are you going out on maternity leave. I'm going to get an office made upstairs and you're just going to deliver up there and come right back down to work. Who's going to handle, you know, all this work; what's going to happen to my division. Who's going to run AND1. And I kept saying, you know, Artie it's okay, relax.

(*Id.* at 272.) Plaintiff testified that after that conversation with Arthur Rabin, "when I would walk into his office, he would always say, here comes the lady with the baby." (*Id.* at 273–74.) Plaintiff testified that she was "bothered" by Arthur Rabin's remarks. (*Id.* at 288.) She also informed Jason Rabin that it appeared Arthur Rabin was "getting nervous" about her upcoming maternity leave. (*Id.* at 263–64.)

Defendant provided plaintiff with twelve weeks' paid maternity leave, which Jason Rabin personally authorized. (PSAF ¶ 40.) Although defendant provided plaintiff with forms titled "Request For Leave Under The Family And Medical Leave Act" and "Certification of Health Care Provider" in conjunction with her upcoming maternity leave, plaintiff never submitted any FMLA paperwork in connection with that leave.[5] (DSF ¶¶ 72–74; PRSF ¶ 72; Pl. Dep. at 303–304; Pl. Dep. Ex. 17.) On or about January 26, 2007, plaintiff began her maternity leave and was scheduled to return to work on or about April 30, 2007. (DSF ¶ 77; PSAF ¶¶ 39–40.)

In March 2007, prior to her scheduled return, plaintiff received a phone call from Murray and defendant's human resources head, Mark McLaughlin. (Pl. Dep. at 304–305.) Plaintiff testified that during that call, Murray informed her that her position had been "eliminated" and that the And–1 line was to be consolidated under Scott Mariner.[6] (*Id.*; DSF ¶ 44.)

On May 29, 2007, plaintiff's counsel wrote a letter to Jason Rabin alleging, *inter alia,* that defendant discriminated against plaintiff and that her termination violated federal and New York City law. (Pl. Dep. Ex. 20.) On June 18, 2007, plaintiff submitted an EEOC Charge of Discrimination. (Pl. Dep. Ex. 21.) The EEOC dismissed that charge and issued a right-to-sue letter on September 21, 2007. (Pl. Dep. Ex. 23.) Plaintiff filed the instant lawsuit on October 10, 2007.

**Defendant eliminates other division head positions**

Between July 2006 and March 2008, six division head positions at defendant were eliminated (including plaintiff's position), and the apparel lines under those divisions heads consolidated into other divisions:

- In July 2006, about one month after Murray was hired, Steven Lee was fired, and the Calvin Klein line was consolidated under Mary Ellen Geoghan (and subsequently under Robert Langer). (DSF ¶ 43.) Lee is a male who had never taken maternity-related

---

5. In her 56.1 statement, plaintiff asserts that Jason Rabin "told her that she was not required to submit any paperwork" (PRSF ¶ 72), but during her deposition, plaintiff testified simply that it was *her understanding* that she needed to submit paperwork only if she was receiving unpaid leave under the FMLA (Pl. Dep. at 303).

6. Plaintiff testified that, during that call, McLaughlin offered to pay her for an additional four weeks after her maternity leave was scheduled to conclude and to provide a letter indicating that plaintiff's dismissal was not performance-related. (Pl. Dep. at 306–307.) However, plaintiff rejected that severance offer and thus received no letter and no further compensation after April 30, 2007. (*Id.* at 317, 333.)

leave while employed by defendant. (*Id.*)

- In March 2007, Geoghan was fired, and her Izod line was consolidated under division head Michael DeVito. (DSF ¶ 45.) Geoghan is a female who had never taken maternity leave or been pregnant while employed by defendant. (*Id.*)

- In July 2007, Orly Goldstein was removed as division head of the Skechers line and the line was consolidated under division head Mitch Flick. (DSF ¶ 47.) She resigned shortly after. (PRSF ¶ 47.) Goldstein is a female who had never taken maternity leave or been pregnant while employed by defendant. (DSF ¶ 47.)

- In October or November 2007, Langer was discharged. (DSF ¶ 48; PRSF ¶ 48.) The Calvin Klein line (assigned to him in September 2006) was consolidated under division head Kathryn Ferrara; the Kenneth Cole line was consolidated under DeVito; the Timberland line was placed under the direction of Regan Romei and subsequently assigned to division head Steven Pinkow; and the Ocean Pacific line was consolidated under division head Kathy Ryan. (DSF ¶ 48.) Langer is a male who never took maternity-related leave while employed by defendant. (*Id.*)

- In March 2008, Jack Shaab voluntarily left defendant. (DSF ¶ 49; PRSF ¶ 49.) He had been informed by Jason Rabin that "it wasn't working out" and that he "has not performed the way he should have performed," and after his G–Unit line was discontinued, he had been acting as a sales representative selling to certain small specialty accounts and discounters since approximately August 2007. (DSF ¶ 49.)

These dismissals were part of broader layoffs by defendant. In 2006 and 2007, more than 250 employees were terminated. (DSF ¶ 52.) As plaintiff herself explained:

> The whole company was experiencing tough business conditions, kind of some of the things I talked about with the consolidation of retailers; retailers cutting back on what they were ordering because the sale—retail was tough.

(Pl. Dep. at 383.)

**Unsold inventory serves as the main performance metric**

The ultimate decision to fire division heads rested with Jason Rabin, although he reached those decisions in consultation with others, including Murray. (*See* August 14, 2008 Deposition of Jason Rabin ("J. Rabin Dep.") at 90–91, 98, 147, 165; June 30, 2008 Deposition of Ronald Murray ("Murray Dep.") at 33–36, 43–44, 70.) Although plaintiff asserts that Murray, not Jason Rabin, made the final decision to terminate plaintiff's employment (*see* PRSF ¶ 83), this is inconsistent with deposition testimony from both Murray and Jason Rabin. Indeed, Jason Rabin testified that he delayed plaintiff's termination, despite Murray's recommendation to the contrary. (*See* J. Rabin Dep. at 90, 163 ("And that's why when Ron [Murray] originally mentioned to me about his feelings [that plaintiff should be fired], I said please, let's give her a chance.").)

The primary performance metric Murray used in identifying which division heads he believed should be fired was their ability to manage and liquidate unsold inventory. (DSF ¶ 29.) Excessive unsold inventory adversely affected defendant's business in a number of ways. For example, defendant incurred significant costs for warehousing unsold inventory; unsold inventory resulted in reduced revenues because goods had to be sold at reduced

prices to be cleared; and the inability to liquidate unsold inventory negatively impacted the company's ability to meet revenue projections it provided to investors. (*Id.* ¶ 31.) Division heads for established[7] apparel lines were accountable for maintaining acceptable levels of unsold inventory for the lines they managed. (*Id.* ¶ 34.) During plaintiff's employment, Murray often stressed the importance of reducing the levels of unsold inventory in group and individual meetings with plaintiff and other division heads. (*Id.* ¶ 32.)

Defendant regularly generated reports setting forth sales and inventory data for each apparel line, and Murray relied upon these inventory reports in evaluating division head performance. (DSF ¶ 36.) According to plaintiff, averaging the inventory levels at the end of each month from June 30, 2006 through March 30, 2007 produces the following results:

| Brand | Division Head | Unsold Inventory |
| --- | --- | --- |
| Ocean Pacific | Mr. Langer | 32.5% |
| Calvin Klein | Mr. Langer | 30.4% |

| Izod | Mr. Langer and Ms. Geoghan | 28.8% |
| --- | --- | --- |
| G–Unit | Mr. Shaab | 27.8% |
| **And–1** | **Plaintiff** | **24.6%** |
| Kenneth Cole | Mr. Langer | 24.4% |
| Skechers | Ms. Goldstein | 24% |
| Ecko | Mr. Root | 21.8% |
| Rocawear | Mr. Cohen | 21.8% |
| Timberland | Mr. Langer | 15.3% |

(PRSF ¶ 38.)[8]

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is inappropriate if the court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a

7. Defendant asserts that heads of unestablished lines were not accountable for unsold inventory to the same extent as heads of established lines because initial sales projections and buys for new lines were made by management. (DSF ¶ 35.) Plaintiff disputes that Murray made such a distinction in his performance evaluations. (PRSF ¶ 35.) However, this dispute is of no real moment, because plaintiff and the other relevant division heads were all in charge of established lines.

8. Defendant offers slightly different unsold inventory numbers, using an average of the average monthly levels (as opposed to averaging the inventory levels at the end of each month, as plaintiff does) (DSF ¶ 38):
 Calvin Klein (Mr. Lee, Ms. Geoghan and Mr. Langer): 33.3%
 G–Unit (Mr. Shaab): 30.7%
 Izod (Ms. Geoghan): 29.6%
 And–1 (Plaintiff): 27.4%
 Kenneth Cole (Mr. Langer): 26.6%
 Skechers (Ms. Goldstein): 26.5%
 Rocawear (Mr. Cohen): 24.3%
 Ecko (Mr. Root): 23.5%
 Ocean Pacific (Mr. Langer): 20.6%
 Timberland (Mr. Langer): 18.3%
 Baby Q (Mr. DeVito): 13.4%
 Kids Headquarters (Mr. DeVito): 13.2%
 U.S. Polo (Mr. Marmer): 11.1%
 Avirex (Mr. Marmer): 9.8%
 Levis (Ms. Ryan): 8.5%
 Character Upstairs (Mr. Flick): 8.3%
 Sleep/Underwear (Mr. Azouley): 4.9%
 Heyman Classic (Ms. Carroll): 2.8%
 Character Mass (Ms. Ryan): 2.0%
 Allison (Mr. Pinkow): 1.7%

verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal citations and quotation marks omitted).

## II. Employment Discrimination Claims

### A. Applicable Law

Title VII protects individuals from discriminatory employment practices based on sex. 42 U.S.C. § 2000e–2(a). The Pregnancy Disability Act amended Title VII to specify that sex discrimination includes discrimination on the basis of pregnancy. *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 277, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *see also* 42 U.S.C. § 2000e(k).

■ The "ultimate issue" in any employment discrimination case is whether a plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," that is, whether there was discriminatory intent. *See Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 119 (2d Cir.1997); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) she is a member of a protected class (2) with the qualifications for the position at issue (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See id.* at 802 & n. 13, 93 S.Ct. 1817; *Gregory v. Daly,* 243 F.3d 687, 695–96 (2d Cir. 2001); *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400–401 (2d Cir.1998) (same for pregnancy discrimination claims) (internal citations omitted); *Forde v. Beth Israel Med. Center,* 546 F.Supp.2d 142, 149 (S.D.N.Y. 2008).

■ If the plaintiff establishes a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Stratton v. Dep't for the Aging,* 132 F.3d 869, 879 (2d Cir.1997); *see also Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097. If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v.*

*Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). "The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason." *Forde,* 546 F.Supp.2d at 150 (citing *Fields,* 115 F.3d at 120–21; *Connell v. Consol. Edison Co.,* 109 F.Supp.2d 202, 207 (S.D.N.Y.2000)). To satisfy this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case, as well as additional evidence, which may include direct or circumstantial evidence of discrimination. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Harris v. City of New York,* No. 03 Civ. 6167(DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004).

 It is not sufficient, however, for a plaintiff to show merely that she satisfies "*McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James,* 233 F.3d at 153. Instead, the appropriate question is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue—that is, whether the record contains sufficient evidence to support an inference of discrimination. *See Forde,* 546

F.Supp.2d at 150 (citing *James,* 233 F.3d at 154; *Connell,* 109 F.Supp.2d at 207–08).[9]

## B. Application

 Defendant concedes, for purposes of this motion, that plaintiff has satisfied her burden on the first three [10] elements of her *prima facie* case, but defendant argues that plaintiff fails on the fourth element because plaintiff's comparative job performance as a division head did not warrant her retention. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Mem.") at 5 n. 2.) Alternatively, defendant argues that even if we find that plaintiff has made the requisite *prima facie* showing, it has offered a legitimate and non-discriminatory reason for plaintiff's termination and plaintiff cannot, on the record before us, satisfy her burden of showing that defendant's non-discriminatory reason is mere pretext for gender or pregnancy discrimination.

Irrespective of the stage of the *McDonnell Douglas* analysis into which this case falls, this summary judgment motion hinges on whether—as defendant maintains—plaintiff's dismissal stemmed from her poor job performance as reflected in her large unsold inventory. In response, plaintiff neither contests that she was among the worst-performing division heads with respect to unsold inventory nor challenges defendant's use of unsold inventory as its primary job performance metric for division managers. Indeed, even using

---

**9.** The *McDonnell Douglas* framework also applies to claims under the New York City Human Rights Law. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir. 2000); *Sullivan v. Newburgh Enlarged Sch. Dist.,* 281 F.Supp.2d 689, 707 (S.D.N.Y.2003). Accordingly, we discuss the Title VII and Human Rights Law claims together.

**10.** Defendant concedes that plaintiff satisfies the second *prima facie* element—that is, that she was qualified for the position at issue.

(Mem. at 5 n. 2.) As defendant notes, "[t]o show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance. Instead, she need only make the minimal showing that she possesses the basic skills necessary for performance of [the] job." *Gregory,* 243 F.3d at 696 (internal citations and quotation marks omitted).

plaintiff's own methodology for calculating unsold inventories, she was one of the four worst-performing division heads employed by defendant. Rather than defend her own performance, plaintiff points to two men with worse inventory numbers whom defendant retained for several months after plaintiff was fired. Plaintiff argues that defendant's decision not to fire those men at or about the same time it fired plaintiff, coupled with what she describes as a "Boys' Club" atmosphere at defendant, is sufficient for her *case* to survive summary judgment. We disagree.

### 1. Sequence of terminations

We first address plaintiff's argument based on the sequence of terminations of division heads at defendant. Plaintiff does not contest that with unsold inventory of 24.6%, she was among the worst-performing division heads at defendant based on Murray's primary performance metric. Instead, she notes that Robert Langer's average unsold inventory during that same period over multiple brands was 26.3%, and Jack Shaab's unsold inventory was 27.8%, and argues that the fact that these worse performers were retained after she was fired satisfies the fourth prong of her *prima facie* claim and demonstrates that defendant's non-discriminatory basis for plaintiff's termination is mere pretext. (Plaintiff's Brief Opposing Defendant's Motion for Summary Judgment ("Opp.") at 1.)

■ As a threshold matter, to the extent that this argument is predicated on the notion that being pregnant and taking maternity leave provide an immunity bath that protects one from discharge based on poor job performance, it fails. Although the law does not permit an individual to be fired because she was pregnant or took medical leave, simply being pregnant or taking leave does not preclude dismissal. *See, e.g., Campbell v. Home Depot U.S.A.,*

*Inc.,* No. 03 Civ. 1421(KMK), 2006 WL 839001, at *8 (S.D.N.Y. Mar. 30, 2006) ("Defendant is not required to provide Plaintiff with favorable treatment because she is pregnant."); *Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 428 (S.D.N.Y.2004) ("The law is clear that an employee may be terminated while on medical leave, as long as the taking of the . . . leave was not the cause for the termination.").

Nor can there be any dispute that plaintiff's other weaker-performing peers suffered adverse employment consequences as a result of their poor job performance. Langer was fired in October or November 2007—just seven-to-eight months after plaintiff was informed that she had been fired, and just six-to-seven months after plaintiff's period of paid maternity leave ended. Indeed, the deposition testimony reflects that Murray recommended to Jason Rabin that Langer be fired at the same time he recommended firing plaintiff, but Jason Rabin delayed Langer's discharge because Langer was in charge of several product lines that were difficult to integrate into other divisions and Rabin was attempting to limit the disruption to his company. (*See* J. Rabin Dep. at 139–43.) As for Shaab, although he was never literally fired in deference to his more than ten years of employment at defendant (Murray Dep. at 41, 68–69), his line was discontinued and he was demoted in approximately August 2007, leading to his ultimate resignation in March 2008. (DSF ¶ 49.)

Plaintiff insists that these explanations are pretextual and that defendant's delay in firing Langer and its failure to fire Shaab at the time plaintiff was fired are proof of discrimination. At the oral argument for this motion, plaintiff's counsel explained:

MR. CASTRONOVO: I'm not saying there is a sequence. I'm saying if they fire Mary Ellen [Geoghan] and Donna Muhleisen in March of 2007 for inventory numbers—which is the sole focus—they should have fired Langer and [Shaab] as well. Anything less is discriminatory treatment.

THE COURT: No, let's follow it through. They have to do it at the exact same time, all of them? Four of them, five of them out, don't care what happens to the company? Shake it up because if we don't shake it up it's a case?

MR. CASTRONOVO: Not the exact time, but I would say in rough approximation, your Honor.

THE COURT: Well, what's your theory as to what the time is?

. . . .

MR. CASTRONOVO: I would say within a few weeks or a month of each other they should all go.

(Oral Arg. Tr. at 23–24.)

The logical conclusion of plaintiff's argument here is that a company's decision to stagger layoffs of key personnel over the course of months rather than weeks in order to minimize business disruption or in deference to seniority would leave that company vulnerable to discrimination lawsuits by the first employees to be discharged.[11] In addition, acceptance of plaintiff's argument would place courts (and juries) in the inappropriate position of second-guessing managers' decisions about whom and when to fire. This is not the law.[12] See, e.g., Rodgers v. U.S. Bank, 417 F.3d 845, 854 (8th Cir.2005) (Title VII has "not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination") (quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir.1995)); Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989) (federal courts do not have a "roving commission to review business judgments") (quoting Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 21 n. 8 (7th Cir.1987)); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.1985) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process").

Plaintiff's argument that the sequence of terminations of underperforming employees supports her pregnancy and gender discrimination claims is further undermined by the fact that the first of the division heads to be fired in this series of layoffs was a man who had never taken maternity-related leave while employed by defendant: Steven Lee, fired in July 2006. In response to this point, plaintiff asserts that we should not consider Lee's termination because Jason Rabin decided to fire Lee, while Murray decided to fire plaintiff. (See Opp. at 13–14.)

11. It is also worth noting that although defendant fired plaintiff before it fired Langer and demoted Shaab, plaintiff was not immediately fired. She was paid for the balance of her maternity leave and was offered—but then rejected—an additional month's severance pay along with a favorable reference letter. (Pl. Dep. 306–307, 317, 333.)

12. Indeed, defendant's decision to fire plaintiff while she was on maternity leave (while permitting her to receive payment for her full period of leave plus severance) seems to reflect good business judgment, as it was likely to be the least disruptive way to handle her dismissal since she had been out of the office for several months already. The alternative for which plaintiff's counsel seems to advocate—that defendant was required to permit plaintiff to return to work for some nominal period of time before firing her—makes little real-world sense.

However, this argument is based on the fundamentally flawed premise that Murray is the relevant decisionmaker here. To the contrary, the deposition testimony in the record establishes that Jason Rabin made the final decision to fire *all* the division heads at issue—including Lee and plaintiff. (*See, e.g.*, Murray Dep. at 70 ("Q: Who made the decision to terminate Mr. Langer's employment? A; Ultimately Jason [Rabin]. I mean they ultimately all rested with Jason to make those decisions.").) The testimony also reflects that, like in the decision to fire plaintiff, Jason Rabin consulted with Murray before deciding to fire Lee, albeit to a lesser extent. (Murray Dep. at 126–27.) As such, plaintiff's argument for excluding Lee's firing from our consideration here seems little more than an effort to slice and dice the sequence of events to avoid facts that do not promote her case.

 In addition, that Jason Rabin, and not Murray, was the primary decisionmaker on the relevant firings is particularly significant because Jason Rabin also personally offered plaintiff her job at defendant—an offer made just over a year earlier and extended while plaintiff was on a previous period of maternity leave. This sequence evokes the Second Circuit discussion of the "same actor" rationale: "when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsis-

tent with his decision to hire." *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003). Although we do not rely solely on the "same actor" rationale in reaching our decision here, it is quite difficult to reconcile Jason Rabin's willingness to hire plaintiff while she was on maternity leave in January 2006 and to provide her three months' paid maternity leave a year later with plaintiff's allegation that he discriminatorily fired her because she was pregnant or because of her gender in March 2007.

Further, an examination of the performance records of the other division heads involved in the relevant series of layoffs and departures also supports defendant's argument that these firings and demotions were performance-based and not discriminatory. Plaintiff was fired during the same month as Geoghan, a woman who never took maternity leave while employed by defendant but whose average unsold inventory during the relevant period was 28.8%. Likewise, Orly Goldstein, whose unsold inventory was 24%, was demoted in July 2007 and resigned shortly after.[13] Like Geoghan, Goldstein had never taken maternity leave or been pregnant while employed by defendant.[14]

To summarize: (1) plaintiff was among the six worst-performing division heads at defendant based on unsold inventory, (2) all those division heads were either fired or left after being demoted during the legally relevant time period, and (3) plaintiff was fired after just over one year by the same individual who hired her. Based

---

13. Murray recommended that Goldstein be terminated in the spring of 2006, but, like with Shaab, Jason Rabin gave Goldstein an opportunity to remain at defendant in a reduced capacity because he had recently recruited her. (Murray Dep. at 73–74.)

14. Plaintiff also argues that defendant's failure to fire the "similar performing [Brian]

Root and [Jonathan] Cohen" supports her discrimination allegations. (Opp. at 12–13.) However, according to plaintiff's own analysis of the relevant unsold inventory data, Root and Cohen both had average inventory levels of 21.8%—better than plaintiff's inventory level of 24.6%. (*See* PRSF ¶ 38.)

on these undisputed facts, we conclude that plaintiff has not (and indeed, could not) show that defendant's proffered non-discriminatory basis for plaintiff's dismissal—sub-standard job performance—was pretextual or that the sequence of dismissals here is evidence of discrimination.[15]

### 2. Alleged favoritism toward male employees

Plaintiff also alleges that defendant was a "Boys' Club," and that "a jury could also find that Defendant did not want to employ a working mother of young children because childcare would crimp its round-the-clock work culture of 6:30 a.m. and 11 p.m. meetings." (Opp. at 1.) In an attempt to support this position, plaintiff cites to remarks made by Arthur Rabin that plaintiff argues reflect his discriminatory animus toward pregnant women. We find plaintiff's assertions on this point unpersuasive.

First, with respect to plaintiff's broad argument that defendant was a "Boys' Club," the record simply does not support that contention. On the contrary, in at least three instances where male division heads were fired or otherwise left defendant during the relevant time period, their divisions were consolidated under female division heads.[16] Moreover, other women have held and continue to hold executive positions at defendant. (*See* Mem. at 6 (noting that Patricia Carroll, Kathryn Ferrara and Kathy Ryan were retained as division heads).)[17] In addition, specifically with regard to plaintiff, it appears that defendant made concerted efforts to accommodate her obligations as a mother of young children. For example, defendant permitted plaintiff to work a four-day workweek[18] and provided her with three months' paid maternity leave.

Likewise, Arthur Rabin's alleged statements during the January 3, 2007 meeting that he was going to "get an office made upstairs and you're just going to

---

**15.** Plaintiff contends as well that defendant fired Langer one month after plaintiff filed her lawsuit in October 2007 merely to "conceal its discrimination." (Opp. at 16.) This argument is wholly undermined by the fact that plaintiff's lawyer threatened to sue defendant in a letter sent in May 2007. (Pl. Dep. Ex. 20.) If plaintiff's threat of litigation was the driving force behind defendant's decision to fire Langer, we would expect that firing would have happened several months earlier.

**16.** In June 2006, Brian Root resigned from his position as head of the Ecko line—one of defendant's largest lines. (DSF ¶ 46.) His division was assigned to a woman, Maria Baldassare. (*Id.*) After Steven Lee was fired in July 2006, his Calvin Klein line was initially consolidated under Geoghan (and later under Langer). (*Id.* ¶ 43.) In addition, after Langer was fired in July 2007, the Calvin Klein line was consolidated under Kathryn Ferrara, and the Ocean Pacific line was consolidated under Kathy Ryan. (*Id.* ¶ 48.)

**17.** We also reject plaintiff's implication that a company environment where employees are expected to work long hours inherently is somehow disproportionately hostile toward women. In support of this flawed contention, plaintiff, citing to Goldstein's deposition, states repeatedly (Opp. at 2, 3) that "[d]ue to long hours and last minute meetings, the women Division Heads would scramble to find childcare and say things like, 'Got to go home to my kids ... this is crazy. Why are we here at 10:00 at night?'" (PSAF ¶ 21.) A review of that deposition transcript shows that plaintiff is distorting Goldstein's testimony, as she testified that *both* men and women would raise these objections. (August 11, 2008 Deposition of Orly Goldstein at 84.) In any case, people earning $250,000 per year and more should not expect to work only 9-to-5.

**18.** Indeed, plaintiff was granted this accommodation in spite of Murray's apparent and not unreasonable concern that her truncated work schedule would prevent plaintiff from being available for certain meetings. (PSAF ¶ 23.)

deliver up there and come right back down to work"—even construed in the manner most favorable to plaintiff's claims—provide no foundation on which for this lawsuit to proceed. In the first instance, plaintiff has made no showing that Arthur Rabin participated meaningfully in the decision to fire plaintiff or the other division heads at issue here. Rather, the testimony reflects that that decision was made by Jason Rabin, in consultation with Murray and others. (J. Rabin Dep. at 90–91, 98, 147, 165; Murray Dep. at 33–36, 43–44.) Indeed, Arthur Rabin testified that he did not learn of the decision to fire plaintiff until after it had been made. (September 20, 2008 Deposition of Arthur Rabin at 74–75 ("I believe [Jason Rabin] told me about [the decision to fire plaintiff] once it happened.").) Statements by non-decisionmakers are not sufficient to show pretext. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir.1997) (remarks by non-decisionmaker "provide no basis for imputing ... an invidious motivation for the discharge"); *see also Burrell v. Bentsen*, No. 91 Civ. 2654(KMW)(NRB), 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993).[19]

We also agree with defendant that Arthur Rabin's statements amounted to little more than "stray remarks" that are insufficient to sustain a reasonable inference that defendant was motivated by pregnancy or gender discrimination in its firing of plaintiff, and thereby to satisfy plaintiff's burden of showing pretext. *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111,

115 (2d Cir.2007) ("the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"). Besides not having been made to or around the relevant decisionmaker here, Arthur Rabin's statements are also too ambiguous to be probative. *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F.Supp.2d 282, 291 (S.D.N.Y.2002) (holding that ambiguous and abstract comments by non-decisionmakers were insufficient to raise an inference of discrimination). Although plaintiff interprets the statements as indicative of discriminatory animus, Arthur Rabin's comment that plaintiff needed to return quickly from maternity leave could also be construed as affirming her importance to defendant. Most likely, Arthur Rabin's statements during the January 3, 2007 meeting reflected his concerns regarding the management of plaintiff's apparel line following problems with deliveries and with the beginning of plaintiff's maternity leave fast approaching. Accordingly, such statements, without more, are insufficient to salvage plaintiff's lawsuit on summary judgment.

In arguing otherwise, plaintiff attempts to draw parallels between this case and two Title VII cases decided by the Second Circuit. (Opp. at 11–12.) We believe both of these cases are distinguishable. In the first, *Kerzer*, the plaintiff alleged pregnancy discrimination in violation of Title VII.

---

**19.** Invoking the "cat's paw" or "conduit" theory of employment discrimination liability, plaintiff alternatively argues with respect to Arthur Rabin that "[t]he discriminatory animus of a non-decision-maker can infect the entire process if that animus makes its way to the decision maker." (Opp. at 14–15.) However, this theory, "in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory

employment action," *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir.2006), is not applicable here. Indeed, no one contends that Arthur Rabin was Murray's or Jason Rabin's subordinate. In any case, as discussed above, the record also does not reflect that Arthur Rabin participated substantively in the decision to fire plaintiff—let alone that he somehow "duped" Jason Rabin into firing her to further his own discriminatory ends.

After the district court granted summary judgment for the defendant employer, the Court of Appeals reversed and remanded the case, finding that Kerzer had raised a genuine issue of material fact as to whether her pregnancy and maternity leave were the reasons for her termination. *See Kerzer*, 156 F.3d at 402–403. In that case, the proffered non-discriminatory reason for terminating Kerzer was that the defendant company no longer required her continued services. Kerzer succeeded in rebutting that non-discriminatory basis for dismissal by citing, *inter alia*, to alleged comments by the president of the defendant company that "an employer could easily get away with [discharging a pregnant employee], by stating that the position was eliminated" and that "[Kerzer's] pregnancy was a sign that she was lazy." *Id.* Moreover, Kerzer pointed to evidence that another non-pregnant individual was hired to take over many of the same duties that Kerzer had performed prior to her determination, suggesting that Kerzer's position had not, in fact, been eliminated. *Id.*

Here, defendant asserts that its reason for firing plaintiff was poor job performance, and it has pointed to numerous other performance-based terminations and an objective mechanism for evaluating performance that plaintiff does not challenge. Plaintiff's position also was not filled by a new hire. Further, plaintiff cites to no allegedly discriminatory statement comparable to those at issue in *Kerzer*.

The other Second Circuit case upon which plaintiff relies, *Quaratino v. Tiffany & Co.*, 71 F.3d 58 (2d Cir.1995), is similarly distinguishable. In that case, the plaintiff's immediate supervisor asked her, "Are you really serious about your career, or are you just going to go home and get pregnant?" *Id.* at 61. Subsequent to those statements, and while Quaratino was on maternity leave, she was fired as part of what the defendant called a "reorganization." *Id.* In reversing the district court's grant of summary judgment for the defendant, the Court of Appeals noted that the defendant had taken measures to replace Quaratino with a non-pregnant female, holding that, taking all these facts into account, Quaratino had made the requisite *prima facie* showing under *McDonnell Douglas*. *Id.* at 65–66.

As with *Kerzer*, the facts in *Quaratino* are markedly different from the instant case. Plaintiff here has made no showing that her position was not, in fact, eliminated and that her apparel line was not consolidated under another division head. Likewise, Arthur Rabin's statements to plaintiff do not support an inference of discrimination, particularly when compared to the overtly discriminatory statements made by Quaratino's supervisor.

To summarize, defendant here has offered a non-discriminatory reason for its decision to fire plaintiff—namely, her poor job performance. Plaintiff does not dispute that she had among the highest unsold inventories at defendant, nor does she challenge defendant's use of unsold inventory data as a job performance metric. Instead, plaintiff argues that defendant's decision to fire her months prior to firing other poor-performing executives, combined with certain statements made by Arthur Rabin (who did not participate in the decision to fire plaintiff), creates a triable issue such that this case must survive summary judgment and go to a jury. We disagree. Plaintiff has presented no evidence that would lead a reasonable juror to conclude that her termination was motivated by gender or pregnancy discrimination, or that defendant's proffered reason for her termination was pretextual. Moreover, the record is clear that the decisionmaker, Jason Rabin, hired plaintiff when she was on maternity leave, accommodated her request for a four-day work-

week, and gave her a three-month paid maternity leave approximately one year later when she became pregnant again. Accordingly, and because plaintiff has failed to show that there exists a genuine issue of material fact in this case, defendant's motion for summary judgment must be granted with respect to plaintiff's claims under Title VII and the New York City Human Rights Law.

### III. Plaintiff's Retaliation Claim Under the FMLA

Plaintiff also alleges that her termination while on maternity leave constitutes a violation of the FMLA. The FMLA makes it unlawful for any employer either "to interfere with, restrain or deny the exercise of or the attempt to exercise, any right" it grants. 29 U.S.C. § 2612(a)(1)(C). To make out a *prima facie* claim of FMLA retaliation, a plaintiff must establish that (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir.2004).

Here, it is undisputed that although defendant provided plaintiff with forms titled "Request For Leave Under The Family And Medical Leave Act" and "Certification of Health Care Provider," along with other paperwork by which to request leave under the FMLA, plaintiff never formally exercised her right to that unpaid leave under the FMLA by submitting that paperwork. (*See* DSF ¶¶ 72–74; PRSF ¶ 72; Pl. Dep. at 303–304; Pl. Dep. Ex. 17.) Plaintiff's failure to submit the FMLA paperwork is hardly surprising, since defendant offered her a preferable arrangement to that which is required under the statute—that is, twelve weeks' *paid* maternity leave. Plaintiff's decision

not to complete the FMLA paperwork means that she is unable now to satisfy the first element of her *prima facie* claim of retaliation. *See Moore v. Potter,* 353 F.Supp.2d 410, 415 (E.D.N.Y.2005) (finding that the first element of a *prima facie* claim of FMLA retaliation was not satisfied where plaintiff failed to follow the proper procedures in asking for leave); *see also Bailey v. Southwest Gas Co.,* 275 F.3d 1181, 1185 (9th Cir.2002) ("In response to an employer's inquiries, an employee must explain the reasons justifying the requested leave so as to allow the employer to determine whether the FMLA is implicated."); U.S.D.O.L. Non–Military Frequently Asked Questions (available at www.dol.gov/esa/whd/fmla) at 9 ("If the employee never provides a medical certification, then the leave is not FMLA leave.").

Moreover, even had plaintiff properly invoked her FMLA rights, for the reasons set forth above in Part II, plaintiff has failed to provide sufficient evidence that her termination was motivated by gender or pregnancy discrimination and that defendant's proffered reason for her termination was pretextual for her FMLA retaliation claim to survive summary judgment. *See Moore,* 353 F.Supp.2d at 414–15 (observing that in analyzing FMLA retaliation claims, courts have "borrowed the framework employed in cases brought pursuant to Title VII" (citing *Bond v. Sterling, Inc.,* 77 F.Supp.2d 300, 303 (N.D.N.Y.1999))).

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed. The Clerk of Court is respectfully directed to close this case.

**IT IS SO ORDERED.**